UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
DAVID WALSH,                             :
                                         :
        Plaintiff,                       :   CASE NO.: _____
                                         :
   -against-                            :   COMPLAINT
                                         :
NOBLE ENERGY, INC., DAVID L. STOVER,     :   DEMAND FOR JURY TRIAL
JEFFREY L. BERENSON, JAMES E.            :
CRADDOCK, BARBARA J. DUGANIER,           :
THOMAS J. EDELMAN, HOLLI C.              :
LADHANI, SCOTT D. URBAN, WILLIAM T.      :
VAN KLEEF, and MARTHA B. WYRSCH,         :
                                         :
        Defendants.                      :
---------------------------------------- X

Plaintiff David Walsh ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Noble Energy, Inc. ("Noble Energy" or the "Company") and members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Noble Energy, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and for breaching their fiduciary duty of candor under Delaware State law. Plaintiff's claims arise in connection with the proposed merger between the Company and Chevron Corporation ("Chevron").

2. On July 20, 2020, Noble Energy entered into an agreement and plan of merger (the

1

"Merger Agreement"), pursuant to which Chelsea Merger Sub Inc., a wholly owned subsidiary of Chevron ("Merger Sub"), will merge with and into Noble Energy, in an all-stock transaction valued at approximately $5 billion, or $10.38 per share (the "Proposed Transaction" or "merger"). Should the Proposed Transaction be consummated, each share of Noble Energy common stock outstanding will receive approximately 0.1191 shares of Chevron common stock (the "Merger Consideration").

3. On August 11, 2020, in order to convince Noble Energy's public common stockholders to vote in favor of the merger, the Board authorized the filing of a materially incomplete and misleading Registration Statement on Form S-4 (the "Registration Statement") with the SEC. The Registration Statement contains materially incomplete and misleading information concerning: (i) the multiple sets of financial projections prepared by management at the Company; (ii) the valuation analyses performed by the Company's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"); and (iii) disclosure concerning non-disclosure agreements entered into by other interested parties and whether they contained 'Don't Ask, Don't Waive' ("DADW") provisions.

4. The shareholder vote will be scheduled in the coming weeks, as the Proposed Transaction is expected to close in the fourth quarter of 2020 (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Transaction.

5. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Delaware State law.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the

Proposed Transaction unless and until the material information discussed below is disclosed to Noble Energy's public common stockholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' misconduct.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. This Court also has jurisdiction over the duty of candor claim pursuant to 28 U.S.C. § 1367.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's common stock trades on the Nasdaq, which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir.

2003) (collecting cases).

## PARTIES

11. Defendant Noble Energy is a Delaware corporation with its principal executive offices located at 1001 Noble Energy Way, Houston, Texas 77070. The Company's common stock trades on the NASDAQ under the ticker symbol "NBL."

12. Defendant David L. Stover is, and has been at all relevant times, the Chief Executive Officer and Chairman of the Board of Noble Energy.

13. Defendant Jeffrey L. Berenson is, and has been at all relevant times, a director of Noble Energy.

14. Defendant James E. Craddock is, and has been at all relevant times, a director of Noble Energy.

15. Defendant Barbara J. Duganier is, and has been at all relevant times, a director of Noble Energy.

16. Defendant Thomas J. Edelman is, and has been at all relevant times, a director of Noble Energy.

17. Defendant Holli C. Ladhani is, and has been at all relevant times, a director of Noble Energy.

18. Defendant Scott D. Urban is, and has been at all relevant times, the lead independent director of Noble Energy.

19. Defendant William T. Van Kleef is, and has been at all relevant times, a director of Noble Energy.

20. Defendant Martha B. Wyrsch is, and has been at all relevant times, a director of Noble Energy.

21. The defendants identified in paragraphs 12 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Noble Energy, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Proposed Transaction

22. Noble Energy is an independent energy company, which engages in the acquisition, exploration, development, and production of crude oil and natural gas worldwide. The company also owns, operates, develops, and acquires domestic midstream infrastructure assets in the DJ and Delaware Basins. Its assets are mostly located in US onshore unconventional basins, and various global offshore conventional basins in the Eastern Mediterranean and off the west coast of Africa.

23. Chevron is global energy company that explores for, produces and transports crude oil and natural gas; refines, markets and distributes transportation fuels and lubricants; manufactures and sells petrochemicals and additives; generates power; and develops and deploys technologies that enhance business value in every aspect of Chevron's operations. It has substantial business activities worldwide.

24. On July 20, 2020, Noble Energy authorized the announcement of the Proposed Transaction. The press release stated as follows:

**Chevron Announces Agreement to Acquire Noble Energy**

SAN RAMON, Calif.--(BUSINESS WIRE)--Chevron Corporation (NYSE: CVX) announced today that it has entered into a definitive agreement with Noble Energy, Inc. (NASDAQ: NBL) to acquire all of the outstanding shares of Noble Energy in an all-stock transaction valued at $5 billion, or $10.38 per share. Based on Chevron's closing price on July 17, 2020 and under the terms of the agreement, Noble Energy shareholders will receive 0.1191 shares of Chevron for each Noble Energy share. The total enterprise value, including debt, of the transaction is $13 billion.

5

> The acquisition of Noble Energy provides Chevron with low-cost, proved reserves and attractive undeveloped resources that will enhance an already advantaged upstream portfolio. Noble Energy brings low-capital, cash-generating offshore assets in Israel, strengthening Chevron's position in the Eastern Mediterranean. Noble Energy also enhances Chevron's leading U.S. unconventional position with de-risked acreage in the DJ Basin and 92,000 largely contiguous and adjacent acres in the Permian Basin.
>
> "Our strong balance sheet and financial discipline gives us the flexibility to be a buyer of quality assets during these challenging times," said Chevron Chairman and CEO Michael Wirth. "This is a cost-effective opportunity for Chevron to acquire additional proved reserves and resources. Noble Energy's multi-asset, high-quality portfolio will enhance geographic diversity, increase capital flexibility, and improve our ability to generate strong cash flow. These assets play to Chevron's operational strengths, and the transaction underscores our commitment to capital discipline. We look forward to welcoming the Noble Energy team and shareholders to bring together the best of our organizations."
>
> "This combination is expected to unlock value for shareholders, generating anticipated annual run-rate cost synergies of approximately $300 million before tax, and it is expected to be accretive to free cash flow, earnings, and book returns one year after close," Wirth concluded.
>
> "The combination with Chevron is a compelling opportunity to join an admired global, diversified energy leader with a top-tier balance sheet and strong shareholder returns," said David Stover, Noble Energy's Chairman and CEO. "Over the last few years, we have made significant progress executing our strategic objectives, including driving capital efficiency gains onshore, advancing our offshore conventional gas developments and significantly reducing our cost structure. As we looked to build on this positive momentum, the Noble Energy Board of Directors and management team conducted a thorough process and concluded that this transaction is the best way to maximize value for all Noble Energy shareholders. We look forward to bringing together our highly complementary cultures and teams to realize the long-term value and benefits that this combination will deliver."

25. The Merger Consideration is woefully inadequate. As recently as June 2020, the company was trading at a higher implied valuation than that of the Merger Consideration, with a 30-day high stock price ***18.3% higher***, and Wall Street consensus targets implying greater than a 25% upside. Indeed, the implied valuation of the Merger Consideration is far worse than the $27.31 per share that Noble Energy was trading at its 52-week high within the past year. Stockholders

6

who bought at that peak, were Chevron's stock price remain unchanged, will walk away from the Proposed Transaction with a pre-dividend loss of approximately 62%.

26. Furthermore, the Proposed Transaction comes at an extraordinarily inopportune time given the attractive valuation of the Company versus peers, strong recent results on the production side, and declining cost structure. For example, Leviathan, a massive natural gas project for the Company near Israel, had just begun to ramp-up production, selling its first barrels of gas into the Israeli market in December 2019, with exports beginning to Egypt and Jordan soon after.

27. Moreover, the Proposed Transaction comes in the midst of the COVID-19 pandemic, at a time when stocks throughout the world are exceptionally volatile due to great uncertainty and radical economic change. The Registration Statement hold outs the implied valuation on the Merger Consideration at a premium, but only when valuating it through the narrow lens of the stock price in the days prior to the merger announcement, hardly a fair assessment of the intrinsic value of a stock.

28. Following completion of the Merger, shareholders of Noble will end up owning around 3% of the combined company. A paltry ownership percentage in exchange for giving up full control of the Company.

29. The resulting ownership ratio from the Merger, when viewed through each companies' cash flow contribution to the *pro forma* combined company is revealing of the unfair nature of the consideration offered. In 2019, Chevron generated $27.31 billion in operating cash flow compared to about $2 billion for Noble Energy. Here, Noble Energy's stockholders will receive 3% of the equity in the combined company. While based off the 2019 results, Noble Energy will be contributing 6.8% of the operating cash flow to the combined entity. Similarly for 2019 EBITDA, the result is that Noble Energy will be contributing 6.3%, with EBITDA of $36.32

billion and $2.43 billion, respectively.

30. Based off the resulting ownership structure and lack of implied premium to the Merger Consideration, the Proposed Transaction fails to maximize shareholder value.

31. In order to effectuate the Proposed Transaction, the Defendants agreed to certain restrictive and preclusive deal protection devices which impede the Company's ability to obtain a better offer or terminate the agreement. For example, the Company entered into a "No Solicitation" provision which prohibits seeking a better offer for stockholders, According to the Merger Agreement, should Noble Energy terminate the agreement, it shall have to pay Chevron a whopping $176,295,000.00 termination fee. This all but ensures no better offer will be forthcoming.

32. For their part, the Individual Defendants stand to be richly compensated should the Merger be completed. Defendants have been promised a vast array of particularly lucrative deal devices such as: golden parachutes, severance packages, employment agreements, accelerated vesting of options, and other indemnification and considerations. The Company even agreed to $40,000,000.00 'integration pool' to 'award' executives at the Company, with Defendant Stover standing to receive nearly $5 million from this pool, a benefit not shared with the minority stockholders who will be receiving unfair consideration. Together, these deal devices have the potential to grant Defendants tens of millions of dollars in compensation unique to them.

33. Piggybacking off the uncertainty of pandemic, the Proposed Transaction may inordinately compensate Chevron shareholders and reward the Individual Defendants, all at the expense of the Company's common stockholders. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for stockholders to properly exercise their corporate

suffrage rights and in order to cast an informed vote on the Proposed Transaction.

**B. The Registration Statement Omits Certain Material Information**

34. On August 11, 2020 Defendants authorized the filing of a materially incomplete and misleading Registration Statement with the SEC. The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents or omits material information concerning the financial analyses conducted by J.P. Morgan, information which is necessary for Noble Energy's stockholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

35. *First*, the Registration Statement fails to disclose information concerning the financial projections created by management and relied upon by J.P. Morgan in creating its fairness opinion. Management created four different scenarios for the Company, each tell a drastically different story of the future value of the Company, the four cases are as follows: (i) Base case, which utilizes Base case commodity price assumptions and base activity level assumptions, (ii) Strip+ case, which utilizes Strip+ price commodity assumptions and base activity level assumptions, (iii) Strip+ Low case, which utilizes Strip+ price commodity assumptions and low activity level assumptions and (iv) Upside case, which utilizes Upside commodity price assumptions and base activity levels.

36. Yet the Registration Statement fails to state: (i) when any of the sets of projections were created; (ii) the differences in the assumptions between the Base case, Strip+ Case, and Upside Case; (iii) the reasons why the Strip+ Low was necessary, especially as every other case disregards its unique assumptions; (iv) which set of projections management believed was most

9

like to come to fruition; and (v) which sets of projections were provided to bidders.

37. Moreover, all cases disclosed omit critical financial projections, including the net income projections (the "Net Income Projections"). Defendants elected to summarize the projections for Noble Energy in the Registration Statement, but they excised and failed to disclose the Net Income Projections. By providing this limited summary in the Registration Statement and withholding the Net Income Projections, Defendants render the tables of projections on pages 73-74 of the Registration Statement materially incomplete and provide a misleading valuation picture of Noble Energy. Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

38. Unlike poker where a player must conceal his unexposed cards, the object of a Registration Statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a Registration Statement discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the information related to the projections relied upon by J.P. Morgan and the Board but have omitted the above-identified material information. These omissions render the summary of the projections and the Company's financial picture in the Registration Statement misleadingly incomplete.

39. **Second**, the Registration Statement misleading states or omits material information regarding the analyses performed by J.P. Morgan in rendering its fairness opinion.

40. With respect to the *Selected Public Trading Multiples Analysis*, the Registration

Statement fails to disclose the quantitative results of the analysis, which is a highly significant omission. If the quantitative results of the analysis show that the implied equity value of the Company falls outside the range for the deal, Defendants cannot simply cherry pick a mathematical analysis and make it appear favorable through "qualitative judgments." Or, even if Defendants feel qualitative judgments are necessary, they still must disclose the actual quantitative result of the analysis. To not do so renders the summary disclosed on pages 67-68 of the Registration Statement misleadingly incomplete. Furthermore, Defendants must disclose (i) J.P. Morgan's assumptions for selecting each of the companies observed; (ii) the quantitative results (as described above); (iii) the assumptions underlying J.P. Morgan's qualitative judgments; and (iv) the individual metrics for each company observed.

41. With respect to the *Selected Transaction Multiples Analysis*, the Registration Statement fails to disclose: (i) J.P. Morgan's assumptions for selecting each of the transactions observed; (ii) the inputs for each of the transactions observed; (iii) the reasons for using only the Base Case set of projections, while utilizing all sets of projections in the *Discounted Cash Flow Analysis*; and (iv) whether the Base Case set of projections was viewed as the most likely to occur.

42. With respect to the *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose (i) the reason why a 37.5% weight was given to each of the Base case and the Strip+ case and a 12.5% weight to each of the Upside case and the Strip+ Low case; (ii) the individual inputs and assumptions underlying the discount rate ranges from 10% to 12%; and (iii) all other inputs and assumptions.

43. The Registration Statement also fails to disclose the analyst price targets observed, and so these price targets and the sources thereof must be disclosed.

44. Fairness opinions are fundamental to the M&A process and is ultimately what

stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have analyses available—such as those omitted here—to determine whether those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing transactions such as these, it becomes all the more critical. As one highly respected professor explained in one of the most thorough law review articles regarding the fundamental flaws of fairness opinions, in a financial analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine how to vote they need access to the above information, and the omission of these metrics makes each financial analysis identified inherently misleading.

45.     ***Third and finally***, the Registration Statement states that the Company were entering strategic combination discussions with other bidders, and that some of the non-disclosures

contained customary standstill agreements, only one of which was stated to have fallen away. *See* Reg. Stmt. at 51. Yet, critically, the Registration Statement fails to disclose whether the other bidders were subject to standstill agreements and whether they contained DADW provisions. The failure to plainly disclose the existence of DADW provisions and confidentiality agreements creates the false impression that any company could have made a superior proposal. If there are confidentiality agreements containing DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

46. This information has been found to be material by both California and Delaware Courts. Indeed, Plaintiff's attorneys have obtained injunctions on this very issue. *See e.g., In re Integrated Silicon Solution, Inc. Stockholder Litigation Consolidated Action*, Case No. 1-15-CV-278812 (injunction granted June 16, 2015 for failure to disclose DADW restrictions). Courts have specifically ruled on this issue and held as to their materiality. For example, the Delaware Court of Chancery granted an injunction in *In re Ancestry.com Inc. S'holder Litig.*, Consol. C.A. No. 7988 (Del. Ch. Dec. 17, 2012), and held that stockholders are entitled to know about DADW clauses, that the Court was "not prepared to allow [the proposed merger] to go to a vote without the stockholders being told about [the DADW clauses]." *Id.* at 228. The Court specifically noted that, without this disclosure, the stockholders were operating under a "false impression that any of the folks who signed the standstill could have made a superior proposal. That's not true. They could only make it by breaching the standstill." *Id.*

47. In sum, the omission of the above-referenced information renders the Registration

Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make an informed decision concerning whether to vote his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violation of Section 14(a) of the Exchange Act)**

48. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Registration Statement or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Registration Statement communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51. The omission of information from a Registration Statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

52. Defendants have issued the Registration Statement with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding the valuation analyses performed by J.P. Morgan in support of its fairness opinion.

53. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

54. The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that J.P. Morgan reviewed and discussed its financial analysis with the Board, and further states that the Board considered the financial analysis provided by J.P. Morgan, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual

Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review J.P. Morgan's analysis in connection with their receipt of the fairness opinions, question J.P. Morgan as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

56. Noble Energy is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

57. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

58. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59. The Individual Defendants acted as controlling persons of Noble Energy within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Noble Energy, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

62. In addition, as the Registration Statement sets forth at length, and as described

herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

64. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### COUNT III

**(Against the Individual Defendants for Breach of Their Fiduciary Duty of Candor/Disclosure)**

65. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

66. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Registration Statement did not omit any material information or contain any materially misleading statements.

68. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Registration Statement to be disseminated to Plaintiff and the Company's other public stockholders.

69. The misrepresentations and omissions in the Registration Statement are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

70. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 14, 2020                         **MONTEVERDE & ASSOCIATES PC**

/s/ *Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*